# EXHIBIT A

**Named Defendants, Roles, and Service Addresses**

This exhibit lists all named Defendants in the Complaint, along with their roles in the alleged criminal enterprise and their known addresses for service. It includes specific allegations tied to each individual or entity's participation in the scheme.

**EXHIBIT A: NAMED DEFENDANTS AND ROLES**

**1. William "Billy" Procida**
Role: Alleged architect and ringleader of the scheme. Controlled 100 Mile Fund and associated entities. Personally signed fraudulent transfer documents and sent threatening communications.
Legal Exposure: RICO conspiracy, wire/mail fraud, extortion, fraudulent transfers, money laundering.
Address: 570 Sylvan Ave, Englewood Cliffs, NJ 07632

**2. Derek Weissman**
Role: Officer at 100 Mile Fund; coordinated with Procida in executing loan-to-own strategy and business sabotage.
Legal Exposure: RICO conspiracy, tortious interference, aiding and abetting fraud.
Address: 570 Sylvan Ave, Englewood Cliffs, NJ 07632

**3. Sills Cummis & Gross P.C.**
Role: Law firm that enabled and coordinated fraudulent transactions, engineered ownership misrepresentations, and pursued adversarial litigation to suppress opposition.
Legal Exposure: RICO conspiracy, aiding and abetting fraud, abuse of process, professional misconduct.
Address: One Riverfront Plaza, Newark, NJ 07102

**4. Michael R. Leighton, Esq.**
Role: Sills Cummis attorney; involved in structuring the fraudulent transactions. Copied on threat emails from Procida and continued prosecution despite known falsehoods.
Legal Exposure: RICO conspiracy, aiding and abetting fraud, mail/wire fraud, professional misconduct.
Address: One Riverfront Plaza, Newark, NJ 07102

**5. 100 Mile Fund LLC**
Role: Procida-controlled entity used to acquire properties through predatory lending and defaults.
Legal Exposure: Criminal enterprise under RICO, fraudulent transfer recipient, unjust enrichment.
Address: 570 Sylvan Ave, Englewood Cliffs, NJ 07632

**6. 100 Mile REIT Inc.**
Role: Affiliate fund involved in financing and ownership of seized assets.
Legal Exposure: RICO enterprise, fraudulent financial conduct.
Address: 570 Sylvan Ave, Englewood Cliffs, NJ 07632

**7. 100 Mile Renard Totowa LLC**
Role: Shill entity used for transfer of 468 Totowa Avenue.
Legal Exposure: RICO predicate actor, fraudulent transferee.

Address: 570 Sylvan Ave, Englewood Cliffs, NJ 07632 and 73 Market Street, Suite 376, Yonkers, NY 10710

**8. Renard Management Inc.**

Role: Affiliate of 100 Mile entities; involved in the fraudulent acquisition of property.

Legal Exposure: RICO co-conspirator, fraudulent transfer agent.

Address: 73 Market Street, Suite 376, Yonkers, NY 10710

**9. Spruce Street Partners LLC**

Role: Entity used in acquisition of Great Falls property; affiliated with Plofker and Brown.

Legal Exposure: RICO enterprise actor, fraudulent transferee.

Address: 7 N Willow Street, Suite 8B, Montclair, NJ 07042

**10. Steven D. Plofker, Esq.**

Role: Owner of Spruce Street Partners LLC and husband of Bobbi Brown. Owns competing real estate projects.

Legal Exposure: RICO co-conspirator, unjust enrichment.

Address: 7 N Willow Street, Suite 8B, Montclair, NJ 07042

**11. Bobbi Brown Plofker**

Role: Business partner to Steven Plofker, investor and beneficiary of Spruce Street Partners.

Legal Exposure: RICO co-conspirator, unjust enrichment.

Address: 7 N Willow Street, Suite 8B, Montclair, NJ 07042

**12. Dino Tomassetti**

Role: Signatory and purported buyer of 468 Totowa. Allegedly unaware of transaction details.

Legal Exposure: RICO actor, fraudulent transferee.

Address: 1590 Troy Avenue, Brooklyn, NY 11234

**13. Eric R. Perkins, Esq.**

Role: Chapter 11 Trustee. Enabled theft and burglary by failing to secure estate, violating fiduciary duties, and acting in collusion with Procida. Oversaw unlawful eviction and tolerated property destruction.

Legal Exposure: RICO conspiracy, civil rights violations under 42 U.S.C. §1983, abuse of process, breach of fiduciary duty.

Address: 354 Eisenhower Parkway, Suite 1500, Livingston, NJ 07039

**14. Shari Hartstein**

Role: Court-appointed estate accountant. Failed to disclose conflict of interest (her brother was part of Procida's takeover team). Withheld Donata Garsia's passport and financial documents.

Legal Exposure: Obstruction of justice, civil rights violations, conflict of interest, breach of fiduciary duty.

Address: Vestcorp LLC, 623 Eagle Rock Ave Suite 364, West Orange, NJ 07052

**15. Harry Byrnes**

Role: Court-appointed auctioneer. Neglected security of the property, leading to thefts.

Legal Exposure: Breach of fiduciary duty, enabling burglary, aiding fraudulent conveyance.
Address: A.J. Willner Auctions, 81 Hamburg Turnpike, Riverdale, NJ 07457

**16. Ernest Rucker, Jr.**
Role: Occupied Garsia family apartment post-eviction without legal authority. Filmed stealing
personal belongings and smoking marijuana.
Legal Exposure: Trespass, burglary, theft.
Address: 74 Chestnut St, Paterson, NJ 07501

**17. NAI James E. Hanson**
Role: Broker for multiple transactions, including those tied to Charles Florio and Procida.
Legal Exposure: Conspiracy, fraudulent transfer facilitation.
Address: 195 North Street, Suite 100, Teterboro, NJ 07608

**18. Patricia A. Staiano, Esq.**
Role: Counsel to the Trustee. Suppressed debtor speech, enabled violations of due process,
and facilitated unlawful actions under color of law.
Legal Exposure: Civil rights violations, aiding and abetting fraud, RICO conspiracy.
Address: Hellring Lindeman Goldstein & Siegal LLP, 103 Eisenhower Parkway, Roseland, NJ
07068

**19. John O'Boyle, Esq.**
Role: Debtor's original counsel. Failed to act in debtor's interest, ignored counterclaim
opportunities, transmitted threats verbatim, and abandoned representation during crisis.
Legal Exposure: Legal malpractice, breach of fiduciary duty, aiding and abetting fraud.
Address: Norgaard, O'Boyle & Hannon, 184 Grand Avenue, Englewood, NJ 07631

**20. Charles Florio**
Role: Procida associate; shares broker network, developer connections. Benefited from system
of distressed property takeovers.
Legal Exposure: RICO conspiracy, unjust enrichment.
Address: 175 Broadway, Paterson, NJ 07505

**21. Andrew Kovar**
Role: Brother of Shari Hartstein; named as part of Procida takeover team.
Legal Exposure: Conflict of interest, RICO conspiracy.
Address: 181 Hudson Ave, Tenafly, NJ 07670

**22. Mario Procida**
Role: Billy Procida's brother. Believed to be behind "468 Totowa Owner LLC."
Legal Exposure: RICO enterprise, unjust enrichment, money laundering.
Address: 456 E. 173rd Street, Bronx, NY 10457

**23. Peter Procida**
Role: Son of Mario Procida and nephew of Billy Procida. Officer in affiliated LLCs.

Legal Exposure: RICO conspiracy, unjust enrichment.
Address: 456 E. 173rd Street, Bronx, NY 10457

---

### JOHN AND JANE DOES (1–50)

The Plaintiff reserves the right to amend this complaint to name additional defendants as discovery and investigative efforts proceed. These include but are not limited to:

- **Financial backers** of the enterprise including individual investors in 100 Mile Fund and Spruce Street Partners
- **Shill buyers** of transferred property assets
- **Professional enablers**, including attorneys, accountants, and appraisers knowingly facilitating fraud
- **Local and state political figures** complicit in enabling the enterprise through silence or action
- **Government agencies**, including NJEDA and related directors, who participated in approving or endorsing actions connected to fraudulent transfers
- **Community organizations and nonprofits**, including NJCDC executives and board members, who may have played a role in legitimizing or facilitating asset transfers
- **Social media platforms** or agents responsible for suppressing Plaintiff's speech during critical phases of whistleblower activity (including the takedown of protected Instagram content)

# EXHIBIT B

**Whistleblower Complaint Filed June 17, 2025**

This is the full federal whistleblower complaint submitted by Plaintiff to the U.S. Trustee. It was stamped received by the U.S. Bankruptcy Court and outlines a broad pattern of systemic misconduct, fraudulent transfers, and fiduciary breaches by the Chapter 11 Trustee and co-conspirators.

Martha Hildebrandt
Assistant United States Trustee, Region 3
Office of the United States Trustee
qne  Newark Center
1085 Raymond Boulevard, Suite 2100
Newark, NJ 07102

**Date:** June 17, 2025

**RE: URGENT WHISTLEBLOWER COMPLAINT - Trustee Misconduct & Bankruptcy Fraud**
**Case:** Great Falls Industrial Park, Inc. (Case No. [Insert if known])
**Trustee:** Eric R. Perkins, Becker LLC

**Dear Ms. Hildebrandt:**

I am submitting this urgent whistleblower complaint documenting systematic abuse of
bankruptcy process, constitutional violations, and coordinated fraud involving Chapter 11
Trustee Eric R. Perkins and multiple co-conspirators.

**IMMEDIATE CONCERNS:**

- **Active retaliation:** Sills Cummis & Gross is currently seeking contempt charges against
  me for exposing this scheme
- **Ongoing harm:** Over 100 wedding clients remain without recourse or refunds
- **Constitutional violations:** Unlawful eviction, mail tampering, suppression of speech
- **Fiduciary breach:** Trustee enabled theft while billing estate for suppression activities

**KEY EVIDENCE INCLUDES:**

- Video footage of trustee team observing ransacked premises and failing to act
- Email proof of social media suppression by court officers
- Documentation of conflicts of interest (trustee's accountant's brother named as Procida
  replacement)
- Financial records showing $725,000+ personal investment by non-owner family
  members

**ACTIVE RETALIATION IN PROGRESS:** Attached as Exhibit A is evidence of active retaliation
a motion filed May 28, 2025, seeking my arrest for failing to produce records that were stolen or
destroyed by the very parties I am exposing. Complete exhibit packet to follow within 5 business
days.

**EXHIBITS ATTACHED:** Whistleblower Complaint (24 pages), Exhibit A-Active Retaliation
Evidence (19 pages)

**WHISTLEBLOWER COMPLAINT**

**Filed by:** David J. Garsia
**Pro Se** — On behalf of himself, his family, and over 100 harmed parties
**Submitted to:** UNITED STATES TRUSTEE — OFFICE OF ENFORCEMENT
**Date:** June 17, 2025

**TABLE OF CONTENTS**

- **SECTION 1:** OVERVIEW
- **SECTION 2:** THE SCHEME AND ITS ARCHITECTS
- **SECTION 3:** Harm to the Public — The Wedding Clients Betrayed
- **SECTION 4:** Control and Collusion — The Role of the Trustee and His Assigns
- **SECTION 5:** Legal Misconduct and Institutional Failure
- **SECTION 6:** Legacy Theft and Irreparable Harm to the Garsia Family
- **SECTION 7:** The Human Toll and Public Harm
- **SECTION 8:** The Cover-Up and Complicity
- **SECTION 9:** The Pattern, the Precedent, and the Silencing
- **SECTION 10:** The Ask — What Justice Requires

**SECTION 1: OVERVIEW**

This whistleblower complaint exposes a coordinated "loan-to-own" scheme perpetrated by private financier William "Billy" Procida and the 100 Mile Fund, enabled by the law firm Sills Cummis & Gross, and executed with the complicity of a U.S. Bankruptcy Trustee and his assigns. What began as a search for a real estate loan became a methodical plan to seize two properties—468 Totowa Avenue and the Great Falls Industrial Park (known as The Art Factory)—by weaponizing foreclosure, abusing bankruptcy procedure, and overriding basic civil and constitutional rights.

But this is not just about a predatory lender. It is about a systemic betrayal by officers of the court—including a trustee who illegally evicted a family, failed to protect estate property, sanctioned burglary, and ultimately handed personal legal and financial records and assets to the adversary—and about a law firm that not only engineered and concealed the scheme but actively effected it and profited from its results.

**A Partnership Built to Fail**

In 2018, our family entered into what we believed was a growth partnership with Procida Funding. With over $12 million in appraised equity and two properties pledged as collateral, the loan was sound and secure. But behind closed doors, Procida and his agents had a different intention: take control of the

properties and businesses, collapse the borrower, and absorb the assets at discount—without paying for them.

Promises of working capital, estate buyout support, and mentorship—offered as part of a larger refinancing and stabilization strategy—were quickly broken. Emails between our attorney and financial advisors show that post-closing support and takeout financing were planned, but never materialized. Instead, interest rates ballooned to a predatory 24-34%, required disbursements were withheld, and financial pressure was deliberately applied. Then, in the middle of the second wave of COVID-era shutdowns, the legal strategy for extra-legal transfer took shape.

**The Trustee's Role: From Fiduciary to Facilitator**

When we filed for Chapter 11 in August 2024, it was a desperate attempt to protect over 150 upcoming weddings, preserve business value, and regain control from a fraudulent lender. But instead of the protection intended by bankruptcy law, we encountered targeted eviction, loss of access, and silencing.

**Within days of conversion to Chapter 7:**

- We were evicted from our legal residence without court order or notice—in direct violation of New Jersey's Anti-Eviction Act and constitutional due process.

- We were barred from retrieving personal or corporate property, including IRS documents, passports, contracts, and records.

- Our office and apartment were burglarized—captured on video—even after we warned both the Trustee's counsel and the court-appointed auctioneer, Harry Byrnes, in writing.

- The property was handed to an unlicensed "security" hire—Ernest Rucker, an unemployed former Paterson zoning officer—who moved into our private home. He burglarized our residence, destroyed our security cameras, used our personal belongings, slept in our beds, showered in our bathrooms, and was recorded smoking marijuana in our living space. He also moved sensitive documents—including estate mail, contracts, and legal filings—out of our apartment and into public areas.

Even as we were barred from the property on the false premise of insurance restrictions, individuals aligned with Procida—including onsite caterer Ameer Natson—were granted ongoing access and allowed to continue business operations. Video evidence confirms this. When asked why Natson was permitted to remain, auctioneer Byrnes replied, "Billy said he's okay."

Video footage taken via Meta smart glasses on November 5 and again on November 15 shows Trustee Eric Perkins, his accountant Shari Hartstein, and Trustee's counsel Patricia A. Staiano surveying our looted office, ransacked home, and legal mail scattered across the premises. Despite this direct knowledge, they failed to secure the records—and later transferred the property, mail, documents, furniture, and personal effects to Procida.

This is not a clerical lapse. It is a profound breach of fiduciary duty under 11 U.S.C. § 704, a violation of federal mail law under 18 U.S.C. § 1708, and a denial of due process under the Fifth and Fourteenth Amendments.

**Sills Cummis & Gross: Legal Architects of the Seizure**

Sills Cummis was not just outside counsel—they were the engine of the takeover. Despite full knowledge that our original loan was secured by two properties with over $12 million in equity:

- They demanded personal guarantees from us—even though we held no ownership interest in the businesses or properties—without adjusting those guarantees when 40% of the collateral was stripped away in a fraudulent transfer.

- They were copied on threatening and coercive emails from their client and proceeded with the plan.

- They orchestrated the fraudulent sale of 468 Totowa, ignoring other bids and using insider entities to simulate an arms-length transaction.

- They sued us on the personal guarantees, secured default judgments amid foreclosure chaos, and used those inflated claims to support a false credit bid.

- They misrepresented to the Bankruptcy Court that the entity receiving Great Falls was "wholly owned" by the 100 Mile Fund—when in fact Secretary of State records confirm it is owned by a direct competitor.

This is not aggressive litigation. It is fraud cloaked in legal procedure. And it calls into question the integrity of every officer of the court involved.

**What Was Lost—and Why It Matters**

**Because of this orchestrated collapse:**

- Over 100 couples lost their weddings and deposits.

- Our family was evicted, burglarized, and erased.

- Longtime employees—some with over 40 years of service—were immediately left without work.

- Vendors and contractors went unpaid.

- The Paterson community lost one of its most iconic redevelopment anchors.

**This complaint is submitted not merely for our own restitution, but for:**

- The over 100 couples whose once-in-a-lifetime events were destroyed without remedy.

- The small businesses who trusted a project that was never meant to survive.

- The people of Paterson, who watched a city-led revitalization project become a cautionary tale of institutional betrayal.

- And every future entrepreneur who may now think twice before trusting the courts, lenders, or lawyers sworn to protect them.

What happened at The Art Factory was not a business failure. It was a failure of law, a collapse of fiduciary trust, and a systemic abuse of power.

**It is time for it to be investigated.**

## SECTION 2: THE SCHEME AND ITS ARCHITECTS

This was not a routine foreclosure. It was a calculated, step-by-step acquisition by deception—a textbook case of predatory lending and insider asset seizure, designed and executed by seasoned operators who presented themselves as allies, only to become the architects of financial, reputational, and operational ruin.

### Core Actors and Entities

**William "Billy" Procida** — President of Procida Funding and founder of the 100 Mile Fund. Marketed himself as a "rescuer" of distressed businesses while running a covert loan-to-own pipeline. Ultimately seized both Garsia family properties through manipulated foreclosure, misleading bids, bankruptcy subversion, and an insider network of collaborators. Publicly styled as a visionary investor, Procida privately dismantled the very businesses he claimed to support—then redirected their value to his own family and fund.

**Derek Weissman** — Partner and Head of Asset Management at Procida Funding. Operated as Procida's enforcer, coordinating site access, tenant deception, and post-transfer logistics. Weissman ordered valuations, dictated sale terms, and liaised directly with receivers, auctioneers, and future owners pre-selected by Procida.

**Sills Cummis & Gross P.C.** — The legal engine behind the scheme. Far from neutral counsel, they aggressively enabled manipulated foreclosures, advanced falsehoods in court, and crafted mechanisms to insulate insider transfers. Despite fiduciary obligations, they protected Procida's interests—not the estate's creditors—and targeted the Garsias with suppression tactics designed to silence and discredit them.

**Shari Hartstein (Vestcorp)** — Appointed by the trustee to secure financial records and conduct estate accounting. Instead, she withheld critical documents—including tax records, legal files, and Donata's passport—and failed to disclose a glaring conflict: her brother, Andrew Kovar, had been named by Procida as part of the planned takeover team. Her neutrality was irreparably compromised, and the integrity of all records in her custody is now in question.

**Eric R. Perkins (Becker LLC), Bankruptcy Trustee, and Assigns** — Tasked with preserving value for creditors, the trustee's office instead acted in concert with Procida. They shut down legitimate business operations, ignored over 100 harmed wedding clients, blocked access to records, and worked to suppress the Garsias' public warnings. Assigned agents like Harry Byrnes—hired under the guise of "security"—enabled looting, destruction, and invasion of privacy. Byrnes hired others to move into David and Donata's private residence, used their clothing and belongings, and allowed data and property theft on a massive scale.

*[Additional parties including Steven and Bobby Brown Plofker, David Placek, Victor Herlinsky, and NJCDC-affiliated board members will be addressed in forthcoming adversary proceedings. Their affiliations with Gensler, the NJEDA, and Cory Booker's donor network suggest a broader political and financial entanglement that underpinned and protected the fraudulent transfer.]*

### Modus Operandi

The blueprint was repeatable and disciplined—engineered to manufacture dependency, trigger default, and quietly capture high-value assets without fair bidding or public scrutiny.

### 1. Position as Savior
Procida styled himself as a mentor and financial partner, promising capital, guidance, and long-term strategic support. Borrowers were assured they were "on his team" and encouraged to share everything—plans, vendors, passwords, and projections.

### 2. Pull the Rug
Once dependence was established, key capital was abruptly denied—particularly estate buyout funds. This destabilized the family business from within, increasing internal pressure and weakening external leverage.

### 3. Assume Financial Control
The Garsias were steered to use banks, vendors, and accountants aligned with Procida—entities that were, in one way or another, financially entangled with him. Though he may not have held formal control of accounts, he had de facto control through these relationships. This structured full dependency, ensuring all financial reporting flowed through channels he influenced or monitored.

### 4. Starve and Threaten
During COVID—a time when the Garsias were barred by law from operating—they nevertheless honored and rescheduled hundreds of weddings at their own expense, doubling their overhead and sacrificing future revenue for the sake of their clients. Instead of offering relief, Procida exploited the crisis: he increased interest rates to punishing levels—as high as 24-34%—stacked on late fees, and issued constant foreclosure threats. There was no bridge funding, no restructuring, no mercy—only a deliberate effort to rob the Garsias of cash and hope, making refinance impossible and salvation unreachable. This was not hardship—it was a setup. The crisis became his leverage, and the foreclosure his reward. Procida perfected his position to seize the assets, while his investors profited directly from the fallout. It was a racket—dirty money reaped by investor families at the expense of the Garsias' own children.

### 5. Stage the Takeover
Due to Procida's manufactured dependency and unconscionable actions, assets were seized under the guise of arms-length market transactions. Offers from legitimate buyers were intentionally suppressed, while handpicked insiders were disguised as independent purchasers. Misleading documents masked the relationships between lender and buyer.

### 6. Exploit the Courts
Legal systems designed to ensure fairness were instead weaponized. Trustees, receivers, and court officers were co-opted or misled. The real goal was never repayment—it was asset seizure, camouflaged as due process.

### The Fraudulent Transfer of 468 Totowa

Procida orchestrated the transfer of 468 Totowa Avenue to himself using a shill entity. Though "Renard" appeared in early filings, the true buyer at closing was 100 Mile Renard LLC, owned and signed for by Procida himself—tying the fraud directly to the 100 Mile Fund.

Despite an internal listing at $9,750,000—ordered by Weissman—the property was fraudulently transferred for less than half that value, using "credit" conjured and controlled by Procida. No money

was paid to the owner. This was no sale—it was a paper sleight of hand, by which a family property of 40 years was taken overnight. In fact, according to Procida's own accounting tricks, the Garsias owed him more than they did two years earlier, despite now having one less property.

Ownership has since been transferred from 100 Mile Renard to 468 Totowa Owner LLC, a company controlled by Mario and Peter Procida, Billy's brother and son. The original "buyer," Dino Tomassini, was a placeholder and agent of fraud. Tomassini and Renard will be named directly in forthcoming suits.

Investors and their families in the 100 Mile Fund—such as Ron Simoncini, a New Jersey real estate publicist—were the direct beneficiaries of the fraud. In a 2023 interview, Simoncini described Procida's strategy with remarkable candor:

"The first guy in is where the real margins are."

That "first guy" was Procida—posing as a financier, but quietly staging a handoff to his inner circle. His investors' children went to private schools funded by money stolen from the Garsias' children. It was a racket—a mobster family playbook dressed in LLCs and court orders.

### The Setup for Great Falls Industrial Park (The Art Factory)

With Totowa secured, the Garsias' ability to obtain replacement financing evaporated. Procida now turned to their more valuable flagship: The Art Factory at Great Falls.

In a news article, he called it "the linchpin" of Paterson and predicted:

"Somebody with a lot of patience will make a lot of money on that property."

He was determined that somebody would be him.

Behind the scenes, he inflated penalties, manufactured defaults, and rejected all reasonable restructuring proposals—while knowing he had already stripped 40% of the collateral by stealing 468 Totowa. While pretending to act as a partner, he instructed the Garsias to prepare and turn over financial projections, client calendars, and engage turnaround consultant Fred Luberto, who developed a full recovery plan.

Procida ghosted him. Internally, he told his team:

"We're going to take the building."

### The Bankruptcy Weapon

On the eve of a rent receiver motion based on **fabricated claims—including phantom tenants**—the Garsias filed Chapter 11 in good faith to protect their business and booked weddings.

Their attorney, John O'Boyle, relayed explicit assurances from the trustee's office: a $50,000 payment to the 100 Mile Fund on September 9, 2024, was necessary to allow the Garsias to continue operations, manage estate funds, and protect all scheduled events. The payment was made.

**It was a lie.**

Just six days after, Donata—still trusting those assurances—used her final personal $9,000 on September 18 to pay a caterer to ensure a bride's wedding, the family was forcibly evicted, without warning.

Instead of delivering her weddings, Donata was personally destroyed by forced eviction, stripped of income, and subjected to hires of the trustee occupying her home like a vanquishing army—in violation of the Third Amendment to the U.S. Constitution.

The trustee's office refused the Garsias' reentry, citing "lack of insurance," yet permitted untrained, uninsured agents to move into her home, wear their clothes, use their children's belongings, and sanction systemic looting of private property and estate files in violation of the Fourth and Fourteenth Amendments to the U.S. Constitution.

Essential legal records and U.S. mail were never returned. As of this filing, the widow of owner David E. Garsia cannot file 2023 or 2024 taxes, and stands to lose a $60,000 IRS refund—while the trustee and his agents remain immune from consequence.

This was not bankruptcy protection.

It was bankruptcy conversion—a coordinated operation to erase the rightful owners and deliver the spoils to insiders under the cover of law.


### SECTION 3: HARM TO THE PUBLIC — THE WEDDING CLIENTS BETRAYED

The most tragic and far-reaching consequence of Procida's predatory scheme was not limited to the financial and emotional devastation inflicted on our family—it extended to over **one hundred couple**s who had entrusted us with the most important day of their lives.

These were not corporate investors or savvy entrepreneurs. They were teachers, nurses, first responders, veterans, young professionals—people who had scrimped and saved to afford a wedding. Many chose Art Factory because it represented something special: a historic venue reborn through creativity, sweat, and community.

#### 3.1 Systematic Deception of the Public

While Procida, Weissman, and their legal agents plotted foreclosure and takeover behind the scenes, they **encouraged us to keep accepting bookings and deposits**—often under the pretense of cooperation and long-term partnership. Even after filing foreclosure in February 2024, they instructed their handpicked advisor (Fred Luberto) to continue working with us to create a plan to "save the business." This false hope **ensured ongoing cashflow** into a system they knew they were actively dismantling.

Couples continued booking weddings. Deposits continued to be accepted. Many booked after the foreclosure action was already filed.

This was not mere negligence. It was a calculated scheme to **milk the business for its final earning**s, while manipulating optics to portray us as mismanagers and themselves as responsible stewards.

#### 3.2 The Trustee's Role in Final Betrayal

After the bankruptcy filing in August 2024—forced upon us by the risk of losing these very weddings—the appointed trustee, rather than acting in the best interest of clients and preserving business value, aligned his actions with the lender's private agenda. These included:

- **Forcing a sudden business shutdown** in September 2024, canceling dozens of weddings scheduled just days away.

- **Evicting my wife and children from our home** on the property, with no warning, recourse, or ability to retrieve personal effects.

- **Turning over security of the venue to an unqualified and hostile third party**—a zoning officer, who proceeded to move into our residence and ransack our belongings, documented on security footage.

- **Allowing selected tenants favored by Procida to remain and operate**, while barring us from entry.

- **Failing to secure or return critical business and personal documents**, despite repeated requests—jeopardizing our ability to respond to IRS audits and maintain legal compliance.

Most egregiously, the trustee **took no meaningful steps to preserve the weddings**, issue refunds, or notify clients in a timely manner. As a result:

- Over 100 couples were financially and emotionally devastated.

- Many lost thousands of dollars with **no refunds**.

- Some learned of their canceled wedding just days before their event date.

- Others were forced to scramble for last-minute alternatives at great personal cost.

### 3.3 Misrepresentation and Media Spin

As panic spread among the wedding clients, Procida and his team orchestrated a **media narrative blaming us** for the collapse—despite the fact that:

- We had invested our family's last resources into the venue, even during bankruptcy.

- We fulfilled over 140 rescheduled weddings **during COVID**, without charge, to protect clients.

- We never missed a single wedding until we were forcibly removed.

This spin campaign allowed Procida and the trustee's allies to shield themselves from scrutiny while using client outrage to justify their own seizure of assets and suppression of our rights.

### 3.4 Broader Public Harm

This scandal extends beyond wedding clients. It includes:

- **Vendors who were not paid** because of the shutdown.

- **Employees and contractors who lost work** during peak season.

- **The Paterson community**, which saw the gutting of one of its most iconic adaptive reuse projects.

- **Historic preservation efforts**, which were stalled or reversed as creative stewardship gave way to demolition and destruction.

These harms are not speculative. They are documented in letters, emails, bankruptcy filings, security footage, and creditor claims.

## SECTION 4: CONTROL AND COLLUSION — THE ROLE OF THE TRUSTEE AND HIS ASSIGNS

The bankruptcy system is designed to protect creditors, preserve value, and administer fair process—not to facilitate the strategic takeover of businesses by the very parties that caused their collapse. Yet in our case, the trustee and his agents abandoned their neutral role and became co-conspirators in the scheme to weaponize the process they were charged to oversee.

### 4.1 From Oversight to Obstruction

Appointed to manage the Chapter 11 case after we were forced to file in August 2024, the trustee—Eric R. Perkins—quickly revealed his alignment with the secured creditor: 100 Mile Fund and William "Billy" Procida. Rather than working to preserve the going concern or ensure an orderly wind-down that honored pre-paid weddings, the trustee:

- Shut the business down mid-season, canceling events that were already scheduled and paid for.

- Denied us entry to the premises—even when décor and preparations were already set up for upcoming weddings.

- Instructed my wife to remove social media posts critical of Procida—an unconstitutional overreach with no legal basis.

- Allowed Procida's associates and favored tenants to remain in operation, while barring the very people who built the business from accessing it.

*[It is worth noting: the trustee never once contacted us to get our side of the story.]*

This was not impartial oversight. It was deliberate orchestration.

### 4.2 Allowing Theft, Trespass, and Sabotage

Following our forced removal, the trustee assigned site "security" not to a bonded firm, but to a former local zoning officer—a municipal insider with no qualifications—who promptly moved into our residence on the property with his girlfriend. They slept in our bed, wore our clothes, used our belongings, smoked marijuana indoors, and were recorded on camera stealing our possessions.

**Security footage and eyewitness documentation confirm the ransacking of:**

- Our children's rooms, where clothing, passports, and birth certificates disappeared.

- Our business offices, where critical files and documents were removed.

- Storage units, from which cash, equipment, and legal documentation were stolen.

- Common areas, where furniture, audiovisual gear, computers, kitchen inventory, and production equipment vanished.

These were not just property losses. This was personal, financial, and legal sabotage. These were the records required for IRS compliance, legal defense, and estate administration. Despite repeated pleas to the trustee's office and our bankruptcy counsel (Norgaard, O'Boyle & Hannon), no investigation occurred. The site remained unsecured. The damage was never remediated.

**4.3 The Shari Hartstein Conflict**

The trustee appointed Shari Hartstein of Vestcorp as the estate's accountant. Her job was to safeguard financial records and ensure accurate documentation. Instead, she:

- Took possession of a select portion of our handwritten ledgers, business records, and personal legal documents in unmarked boxes, without inventory, archive, or chain of custody.

- Left full file cabinets of records behind, which were later handed over to Procida when the trustee gave him the buildings.

- As a result, the origin and integrity of all documents are now irreparably compromised—no party can rely on any record as complete or authoritative.

- Failed to return Donata Garsia's passport and vital family documents.

- Expressed concern in private about Procida's usurious 24-34% interest rates, yet took no corrective action.

- Discovered during a November 5 walkthrough that her own brother, Andrew Kovar, was listed by Procida in takeover documents as a proposed replacement team member—and still did not recuse herself.

This conflict of interest was glaring. Yet Hartstein maintained control over sensitive financial records, many of which remain inaccessible. As a result, the widow of the company's founder has been unable to file personal or corporate tax returns for 2023 and 2024—forfeiting an estimated $60,000+ in refunds and placing the estate in legal and financial jeopardy. The bankruptcy estate's transparency is permanently compromised.

**4.4 Denying the Rights of Creditors**

Most of the couples whose weddings were canceled are now legally considered creditors in the bankruptcy case. The trustee has:

- Failed to affirm, prioritize, or meaningfully resolve their claims.

- Offered no coherent plan for refunds or restitution.

- Allowed the secured lender to credit-bid on assets built by those very clients—using fraudulently inflated valuations that were never independently verified.

Rather than protecting the estate or the public, the trustee protected a predatory insider, enabling him to become a shadow owner through procedural manipulation, forced evictions, and public scapegoating.

**4.5 Weaponizing the Bankruptcy Process**

Just as Procida manipulated private lending laws to force foreclosure under the guise of partnership, the bankruptcy process was likewise inverted. Instead of shielding value and ensuring fairness, it was used to:

- Execute a quiet seizure of property—without a traditional sale.

- Evict dissenting voices and remove key witnesses.

- Create a false narrative of chaos and noncompliance to justify trustee intervention.

- Convert the outrage of harmed clients into cover for the actual perpetrators.

What should have been a protective, court-supervised rehabilitation became a covert acquisition tool—with the trustee as midwife to the takeover.

*[The next section will detail how the assets were ultimately transferred to a so-called "wholly owned subsidiary" of the secured lender—a claim that turned out to be materially false.]*

## SECTION 5: LEGAL MISCONDUCT AND INSTITUTIONAL FAILURE

The scheme carried out against Great Falls Industrial Park, Inc. and the Garsia family did not succeed because of financial default—it succeeded because of a collapse in legal integrity. The attorneys who should have acted as safeguards—whether as officers of the court, fiduciaries to the estate, or counsel to the debtors—instead became enablers of systemic abuse. The most egregious actors among them include Sills Cummis & Gross, the trustee's legal team, and debtor's counsel John O'Boyle.

These were not honest brokers in a complex case. These were legal professionals who tilted the system, silenced the victims, and cleared the path for a fraudulent takeover.

### 5.1 Sills Cummis & Gross: The Legal Engineers of the Seizure

As counsel for the 100 Mile Fund, Sills Cummis & Gross was not a neutral advocate. They acted as strategic architects of a predatory scheme, enabling their client to seize two properties—one of them under the cover of bankruptcy—through fabricated debt figures, misrepresented ownership, and credit bid abuse.

Despite the original loan being secured by more than $12 million in equity and two fully collateralized properties, Sills Cummis:

- **Demanded personal guarantees** from David and Donata Garsia—despite the fact that neither had any ownership interest in the properties or the businesses. These guarantees were structured to ensure the Garsias remained committed to operations while being left exposed to personal liability.

- **Refused to adjust the guarantees** after 40% of the collateral (468 Totowa) was stripped and fraudulently transferred—thus eliminating any possibility of refinance, as acknowledged even by Procida at closing. The removal of that collateral baked failure into the deal from the outset.

- **Filed suit on those personal guarantees** during peak foreclosure chaos—when the Garsias were running the business full-time—and secured a default judgment, not by merit, but by engineering a legal storm in which they knew the defendants could not respond.

- **Oversaw the transfer of 468 Totowa** to an insider entity—100 Mile Renard Totowa, LLC—under the false appearance of a market sale. Because Procida and his agents handled the brokers, showings, negotiations, and disclosures, no independent oversight or transparency was ever possible. Offers from other parties, if they existed, were suppressed or ignored.

- **Used the inflated judgment** from that default to justify a fraudulent credit bid on The Art Factory, again claiming fabricated figures based on punitive interest and coercive leverage.

- **Misrepresented to the bankruptcy court** that the new ownership entity receiving Great Falls was "wholly owned" by the 100 Mile Fund—when, in fact, Secretary of State records confirm it is owned by a direct Art Factory competitor.

Sills Cummis had full access to the data: emails, creditor communications, appraisals, entity structures, and insider threats. They knew the truth. And they moved forward anyway.

**This was not legal representation. It was legal laundering of theft.**

**5.2 A Pattern of Procedural Ambush**

At every procedural juncture, the legal team deployed court filings not as instruments of remedy, but as weapons of disorientation and control:

- They filed foreclosure while simultaneously pretending to pursue a workout with Fred Luberto.

- They delivered motions on timelines so short they effectively barred any response—denying the debtors due process.

- They filed conflicting pleadings in state court, federal court, and bankruptcy court, fracturing the defense landscape and stalling momentum.

None of this was about justice. It was about exhaustion. Every filing bought them more chaos and more leverage.

**5.3 Trustee's Counsel: From Passive Oversight to Active Enablement**

Rather than enforce fiduciary standards, the Trustee's legal team parroted the lender's agenda. Under their watch:

- **No investigation was made** into the clear conflict of interest posed by the Trustee's accountant, Shari Hartstein—whose brother was a named agent in Procida's takeover team.

- **No action was taken** after video evidence was submitted showing the looting of the office, apartment, and mail—despite multiple email warnings from the Garsias, and even a walkthrough onsite with the Trustee himself.

- **Trustee counsel demanded the removal** of all social media posts that explained the truth to the clients—an unconstitutional overreach with no basis in bankruptcy law.

- **They failed to protect 100+ priority wedding clients**—never filing a motion, never pursuing recovery, never even notifying most of them that their event was canceled until it was too late.

- **They failed to secure, recover, or catalog** estate assets, financial documents, or U.S. mail, much of which was ultimately turned over to the opposing party.

This was not negligence. It was orchestration.

### 5.4 Legal Representation Collapsed

Debtor's counsel, John O'Boyle of Norgaard O'Boyle & Hannon, was retained to represent the estate. Instead, he became a passive channel through which opposing counsel dictated outcomes.

**O'Boyle failed to:**

- **Oppose the illegal eviction** of the debtors from their legal residence—even though Donata and the children had lived there for years under a lawful certificate of occupancy.

- **File any motion for injunctive relief** after the theft of IRS documents, contracts, or corporate records.

- **Protect the family's First Amendment rights,** instead transmitting the opposition's threats verbatim and telling Donata to "pull down the social media posts RIGHT NOW."

- **File a counterclaim or object** to the fraudulent transfer of 468 Totowa—despite repeated pleas from David Garsia, who wrote in an email that the Governor's office was ready to get involved.

In response, O'Boyle dismissed the request outright, stating:

"I don't know what you are talking about and I am not filing anything."

That email is now Exhibit C-1.

O'Boyle failed his client. And through his failure, the Garsias lost everything.

### 5.5 Nullification of Victim Voices

Over 100 couples had signed contracts, paid deposits, and planned life-defining events at The Art Factory. Dozens of vendors depended on this business. Employees had worked there for decades. And all of them were erased.

Despite creditor filings and repeated public outcry:

- No plan for restitution was ever proposed.

- No preservation motion was filed.

- No attempt was made to contact or meaningfully involve these families in court proceedings.

The Trustee, debtor's counsel, and Sills Cummis had every opportunity to explain what was happening. Instead, they blamed the victims—and buried the truth.

### 5.6 A Collapse of Institutional Duty

What happened was not a lapse. It was a coordinated breakdown of every system designed to uphold equity:

- The Trustee violated his fiduciary duties, failed to safeguard estate assets, and facilitated constitutional violations.

- Sills Cummis engineered a legal fiction—fabricating bids, laundering ownership, and misrepresenting material facts.

- The Trustee's counsel enabled this at every step.

- Debtor's counsel ignored theft, eviction, coercion, and fraud—and then blamed the victims.

What happened at The Art Factory was not business failure. It was the collapse of law itself.

## SECTION 6: LEGACY THEFT AND IRREPARABLE HARM TO THE GARSIA FAMILY

While the Procida team has made headlines touting a visionary future for the Art Factory, the truth is darker and deeply unjust: they are profiting from the legacy, labor, and life savings of a family they erased—while the very individuals entrusted to protect the estate enabled it.

### 6.1 Personal Contributions and Collateral Loss

Neither Donata Garsia nor David Garsia held a legal interest in the Art Factory at the time of bankruptcy. Yet Donata personally invested over **$725,872.49** into the business from her own savings and loans secured by the marital home. She had no ownership interest—yet risked everything. That home is now in foreclosure—not due to mismanagement, but because the trustee abruptly terminated all income-producing operations and froze all business activity, leaving the Garsias without recourse or income.

**These funds were not speculative investments. They were used to:**

- Complete wedding events that Procida and the trustee shut down mid-stream

- Honor commitments to hundreds of film clients, artists, and vendors

- Maintain brand continuity and advertising

- Sustain payroll and equipment

- Purchase décor, furnishings, lighting, infrastructure, and more

The assets purchased with Donata's funds are now in the possession of the very parties that forced her family out.

### 6.2 Destruction and Negligence by Trustee and Agents

Despite repeated documented notice that the property contained sensitive financial and legal records, private mail, passports, birth certificates, and irreplaceable family items, the trustee and his assigns failed to secure the premises. Instead:

- **Looters**—with tacit approval or instruction from the trustee's auctioneer and agents—entered Donata and David's residence, stole belongings, and moved in with impunity.

- **Ernest Rucker**, a former zoning officer hired by the trustee, was captured on camera destroying security equipment, sleeping in their beds, using their shower, and smoking marijuana inside their home.

- **Private correspondence** between Donata and her attorneys concerning litigation against Procida was found strewn in public hallways, alongside Garsia children's schoolwork and legal documents.

- **U.S. mail was opened, exposed, or discarded**—a potential federal offense under 18 U.S.C. § 1708. *[This may warrant inquiry by the U.S. Postal Inspector General.]*

Firsthand video evidence from Meta smart glasses worn by David Garsia on November 5 and 15, 2024—taken with the Trustee and his legal team onsite—captured this destruction in real time.

Despite this, the Trustee only collected a fraction of the remaining records—and ultimately turned over all personal effects, documents, and equipment to Billy Procida.

This was not passive oversight. It was active breach of fiduciary duty under 11 U.S.C. § 704 and a violation of constitutional due process.

### 6.3 Intellectual Theft and Repackaging of the Garsias' Work

On September 27, 2024, under legal pressure, Donata and David were directed by Trustee's counsel to submit:

- The full architectural plan set for the Great Falls Industrial Park

- Site surveys, zoning documents, insurance materials

- Sprinkler engineering drawings

- 12 years of curated, site-specific development work

Those documents now appear in public photographs from an April 16, 2025 Gensler-led charrette—pinned to walls, presented as "vision" from Billy Procida, and used as the basis for press campaigns and design workshops.

Procida, through his partnership with international firm Gensler, is publicly rebranding the Garsias' approved redevelopment work as his own, gaining accolades and perceived legitimacy from the City and public institutions while denying the authors of the project any credit.

**This is not just misuse of ideas. It is intellectual theft, and it is being conducted in plain view.**

### 6.4 Brand Misappropriation and Public Erasure

While the original creators of the Art Factory have been evicted, defamed, and left in foreclosure, Billy Procida is now being marketed as the visionary founder of the project.

At the April 2025 charrette, Eddie Gonzalez of NJCDC was photographed leaning over the Garsias' original site plans with a pen, much like NJCDC founder Bob Guarasci did at the 2018 neighborhood charrette hosted by Donata.

The narrative being spun in media outlets is one of fresh innovation. In reality, it is:

**"Erase and replace."**

**The Garsias produced:**

- Over 1,200 weddings

- Hundreds of film and television shoots, including Spielberg, Scorsese, Bon Jovi, and Disney

- Free public concerts, art shows, gallery events, and lectures

- Community partnerships with the National Park Service

- Studio space for hundreds of artists and small businesses

- An adaptive reuse model cited nationally for its ingenuity

Yet not only were they excluded from current redevelopment—they were publicly scrubbed from the history of their own creation.

### 6.5 A Final Act of Institutional Betrayal

The Trustee and legal officers did not merely lose control of the estate—they delivered the Garsias' life's work into the hands of their adversary.

**This included:**

- All physical furniture, décor, lighting, and equipment

- Approved architectural and development plans

- Full marketing collateral and brand assets

- Legal documents and casework against Procida

- Planning board approvals and Certificates of Occupancy

- Private communications, trade secrets, and curated event systems

There was no inventory. No protection. No recovery. There was only a handoff.

The result is not only material loss—it is theft of identity and public contribution. The Garsias' four decades of stewardship, recognized by the City and State of New Jersey in 2011, have been rewritten under another man's name.

This is not just a bankruptcy gone wrong. It is legacy theft, institutional betrayal, and the silent obliteration of a family's public contributions.

### SECTION 7: THE HUMAN TOLL AND PUBLIC HARM

While Procida's legal and financial maneuvers were meticulously executed behind the curtain of bankruptcy court, the public-facing consequences were catastrophic. More than 100 couples who had paid in full for weddings at the Art Factory were left devastated—without events, without recourse, and